UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LENCO DIAGNOSTIC LABORATORIES,
INC.,

                Plaintiff,                      MEMORANDUM
                                                        AND ORDER

  -against-

                                                       15 CV 1435 (FB)(RML)

MCKINLEY SCIENTIFIC, INC.,

                Defendant.
----------------------------------------------------------X
LEVY, United States Magistrate Judge:

        Plaintiff Lenco Diagnostic Laboratories, Inc. ("plaintiff" or "Lenco") moves for leave to amend its Second Amended Complaint to add an alternative claim for breach of contract. Defendant McKinley Scientific, Inc. ("defendant" or "McKinley"), the only remaining defendant in this case, opposes the motion. I heard oral argument on November 22, 2019.[1] For the reasons stated below, plaintiff's motion is granted.

## BACKGROUND AND PROCEDURAL HISTORY

        Familiarity with the prior proceedings is assumed. Briefly, plaintiff, a clinical laboratory based in Brooklyn, New York, commenced this diversity action on March 18, 2015. It alleges, *inter alia*, that McKinley, a New Jersey company that acts as a selling agent for new and used laboratory equipment, made false representations to plaintiff regarding its ability to assist plaintiff with developing and certifying a mass spectrometry ("MS") toxicology testing

---

[1] A few days after the oral argument, the parties advised that they were willing to engage in court-annexed mediation. I referred the case to mediation on November 30, 2019, and the parties selected a mediator on December 16, 2019. After receiving extensions of time, the parties completed mediation on June 16, 2020, reporting to the court that they were unable to resolve this case.

operation in accordance with New York State Department of Health ("DOH") procedures.  (See Complaint, dated Mar. 18, 2015 ("Compl."), Dkt. No. 1; Second Amended Complaint, dated Oct. 3, 2018 ("Second Am. Compl."), Dkt. No. 74.)  Lenco claims to be "one of the largest independent clinical labs in the region, with well over 100 employees, offering a full range of diagnostic services to doctors, hospitals and individual patients."  (Second Am. Compl. ¶ 22.)  In 2012, "Lenco decided to add clinical toxicology to its expanding menu of diagnostic services" and thus "needed to purchase MS equipment, consisting of numerous pieces of advance technology machinery integrated with software as well as the necessary supplies, additional staff and support services."  (Id. ¶ 23.)  Plaintiff explains that MS is a "testing procedure that helps identify the amount and type of chemicals present in a sample by measuring the mass-to-charge ratio and abundance of gas-phase ions."  (Id. ¶ 24.)  MS is "a highly complex testing process, involving sophisticated equipment and protocols that enable labs to test for chemical substances in, among other things, urine and blood—with accuracy and sensitivity significantly greater than with other, older testing procedures."  (Id. ¶ 25.)

In addition, according to plaintiff, MS is "a heavily regulated field of diagnostics" and "each state has developed its own regulations and procedures governing certification of labs for MS testing."  (Id. ¶ 26.)  In New York, the DOH "is responsible for quality review and certification of all clinical labs, including with respect to MS testing."  (Id. ¶ 27.)  The DOH's certification procedure "is a multi-step process requiring a lab . . . seeking to engage in MS testing to: (i) provide a set of accurate, reproducible and scientifically robust instructions for MS testing of laboratory samples, commonly referred to as "methods;" (ii) validate these methods internally through a series of scientific experiments, patient sample simulations as well as data collection and analysis, commonly referred to as "Method Validation"; and (iii) submit these

methods and the standard operating procedure manuals ("SOPM") to DOH for review and approval." (Id. ¶ 28.) Labs "are further required to conduct proficiency tests (hereinafter "Proficiency Testing") on simulated patient samples provided by DOH and report the results to DOH, which judges the accuracy of these results in determining whether to provide the lab with the appropriate license." (Id. ¶ 29.)

Because Lenco "had neither the necessary in-house expertise nor sufficient resources" to carry out these requirements, it alleges that it sought out a "turn-key" toxicology operation. (Id. ¶ 30.) Lenco claims that between January and March 2012, Martin Steel, a senior executive at McKinley, repeatedly represented to it that McKinley "was going to be able to deliver precisely the type of 'turn-key' operation Lenco was looking for." (Id. ¶¶ 31-32.)

Lenco alleges that on March 15, 2012, it paid McKinley $608,890 for equipment and services, including: (1) three refurbished "Thermo TSQ Quantum Ultra" machines ("MS Machines"); (2) two "Peak Scientific N2" generators ("Generators"); (3) numerous pieces of supporting equipment; and (4) comprehensive consulting and technical support services necessary to assist Lenco in launching toxicology diagnostics. (Id. ¶¶ 37-38.) One year later, on March 11, 2013, Lenco paid McKinley $531,021 for more MS equipment and services, including three refurbished MS Machines, two new Generators, various items of supporting equipment, and comprehensive consulting and technical support services on that additional equipment. (Id. ¶¶ 64-66.)

According to the Second Amended Complaint, Lenco failed its initial Proficiency Tests with DOH in March 2013, at approximately the time of its second purchase of equipment and services. (Id. ¶ 69.) Despite McKinley's assurances that this was a "minor setback," Lenco claims that it eventually determined that "the entire package of equipment and services

3

purchased by Lenco was riddled with so many deficiencies and shortcomings as to be totally unusable." (Id. ¶ 82.) Ultimately, "Lenco came to believe that the MS Machines it had purchased from McKinley were utterly unsuitable for the only purpose Plaintiff needed them – i.e. to run a high-volume commercial MS diagnostic service in a clinical setting." (Id. ¶ 93.)

In the Second Amended Complaint, plaintiff asserted claims for fraud, conspiracy, and unjust enrichment. (See generally id.) It now moves to amend its complaint again to add an "alternative" claim for breach of contract. It has submitted a proposed Third Amended Complaint. (See Declaration of Joshua M. Lurie, Esq., dated Sept. 20, 2019, Dkt. No. 96, Ex. A.) Defendant opposes the motion, arguing that plaintiff delayed in seeking to amend after representing that it did not intend to pursue a contract theory. (Defendant's Brief in Opposition to Plaintiff's Motion to Amend the Complaint, dated Sept. 30, 2019 ("Def.'s Mem."), Dkt. No. 98, at 1.) Defendant also argues that the proposed amendment should be denied because it is not based on any newly-discovered facts, the last-minute change in litigation strategy would prejudice defendant and lead to additional discovery and delays, and the amendment would be futile. (See id.) I will address defendant's arguments in turn.

### DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "should [be] freely give[n] . . . when justice so requires." FED. R. CIV. P. 15(a). In Foman v. Davis, the Supreme Court set out the standard for motions to amend: "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

4

etc.—the leave sought should, as the rules require, be 'freely given.'"  Foman v. Davis, 371 U.S. 178, 182 (1962).

      B.  Undue Delay

"Delay alone, in the absence of bad faith or prejudice, is not a sufficient reason for denying a motion to amend."  Konig v. TransUnion, LLC, No. 18 CV 7299, 2020 WL 550285, at *2 (S.D.N.Y. Feb. 4, 2020) (quoting Duling v. Gristede's Operating Corp., 265 F.R.D. 91, 97 (S.D.N.Y. 2010)); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion.") (internal citations omitted).  Moreover, "under the liberal standard of Rule 15(a), leave to amend may be appropriate at any stage of litigation."  Duling, 265 F.R.D. at 97; see also Blagman v. Apple, Inc., No. 12 CV 5453, 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (collecting cases where leave to amend was granted after delays of up to seven years).

This case has now been pending for five years.  Plaintiff has amended the complaint twice, most recently in August 2019.  Fact discovery, which began in March 2017, is complete, except for any additional discovery the parties would need relating to the amendment.  Plaintiff claims that the impetus for this motion is defendant's counsel's questioning at a deposition of plaintiff's representative, Dennis Yurovsky, on May 29, 2019.  According to the transcript of that deposition, defendant's counsel, Thomas N. Ryan, made reference to an "agreement" between Lenco and McKinley and elicited responses about the "proposal" and the parties' "contract."  In that transcript, the word "agreement" was uttered more than twenty times, and the word "contract" was said twenty-five times, all to describe a set of invoices.  Mr. Ryan

5

went through the parties' "agreement" in detail, asking what was complied with and what was not. (Transcript of Deposition of Dennis Yurovsky, dated May 29, 2019, Dkt. No. 100-5.)

After the deposition, defendant's counsel sent plaintiff a Rule 11 letter demanding that plaintiff withdraw its unjust enrichment claim, on the ground that the unjust enrichment claim was inconsistent with the existence of a contract.[2] It is true that where a "matter is controlled by contract and the claim for unjust enrichment seeks the same relief as is sought for breach of contract, the unjust enrichment claim is properly dismissed as duplicative." LG Capital Funding, LLC v. Ubiquity, Inc., No. 16 CV 3102, 2017 WL 3173016, at *3 (E.D.N.Y. May 12, 2017), report and recommendation adopted, 2017 WL 3168961 (E.D.N.Y. July 25, 2017); see also Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd., 345 F. Supp. 3d 515, 532 (S.D.N.Y. 2018) ("[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.") (citing Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012)); Digizip.com, Inc. v. Verizon Servs. Corp., 139 F. Supp. 3d 670, 683 (S.D.N.Y. 2015) (dismissing unjust enrichment claim as duplicative of breach of contract claim when the parties did not dispute the validity of the contracts).

However, "New York law . . . 'permits the alternative pleading of breach of contract and unjust enrichment claims—and the survival of both claims at the motion to dismiss stage'—where the applicability of the contract is disputed." Hallmark Aviation Ltd. v. AWAS Aviation Servs., Inc., No. 12 CV 7688, 2013 WL 1809721, at *5 (S.D.N.Y. Apr. 30, 2013) (quoting IceboxScoops v. Finanz St. Honor, B.V., 676 F. Supp. 2d 100, 114 (E.D.N.Y. 2009)); see also FED. R. CIV. P. 8(d)(3) (permitting inconsistent pleading). In other words, either plaintiff can plead both unjust enrichment and breach of contract in the alternative, or it has only

---

[2] The letter is not attached as an exhibit to the motion papers.

a breach of contract claim – which became clear on May 29, 2019, when defendant pursued this line of questioning and elicited the response that there was a contract between the parties. Either way, defendant does not deny that the contract issue was explored at length in plaintiff's representative's deposition on May 29, 2019 (and, apparently, in other depositions in May 2019). Plaintiff wrote to the court regarding its proposed amendment less than ninety days later, on August 23, 2019, which makes defendant's claim of undue delay unpersuasive.

### C. Undue Prejudice to Defendant

Defendant argues that it had a right to know plaintiff's legal theories of the case before engaging in discovery, and since plaintiff never asserted a breach of contract claim—and in fact represented that it had no intention of doing so—defendant "aligned its legal strategy to pursue the defeat of the unjust enrichment claims by establishing a contract." (Def.'s Mem. at 8.) In other words, defendant tried to prove there was a contract, because it thought doing so would defeat the unjust enrichment claim, and it now claims to have been blindsided by plaintiff's attempt to add a breach of contract claim late in the game.

If there actually was a contract between the parties, and plaintiff can prove that defendant breached it, then having to litigate a breach of contract claim is not "undue prejudice." The new claim does not introduce new facts, but only another legal theory. See Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) (holding that courts will allow amendment where the party "had knowledge of the facts giving rise to the [amendment]."); A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (holding that there was no undue prejudice to defendants where the proposed amendments did "not raise factual claims unrelated to the events [in] its original [complaint]."). The factual allegations that would support a breach of contract claim were already in the Second Amended Complaint – the

7

alleged breach is not mysterious; it is the allegation that defendant failed to provide a "turn-key clinical toxicology laboratory utilizing [MS] technology." (Second Am. Compl. ¶ 2.)

Defendant also complains about the "substantial" additional discovery that would be required if plaintiff were granted leave to amend. It argues:

> Defendant would need to explore via interrogatories and notices to produce (prior to additional depositions) the identification of exactly what 'invoices' are allegedly a contract, who prepared those invoices, whether third parties (such as the contracted service providers) had input on those invoices, whether additional documents were allegedly incorporated into the contract – and who prepared those documents. Once those topics were explored at depositions, the specific negotiation of the contract, sophistication of the parties, understandings of the parties and whether those understandings matched the contract – and if not, why not) would also have to be explored.

(Def.'s Mem. at 9.)

This argument is unavailing. First, "the need for new discovery is not sufficient to constitute undue prejudice on its own." Duling, 265 F.R.D. at 100; see also United States v. Cont'l Ill. Nat'l Bank & Tr. Co., 889 F.2d 1248, 1255 (2d Cir. 1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading."); A.V. by Versace, Inc., 87 F. Supp. 2d at 299 ("Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice.'") (internal citations omitted). Second, the parties have already conducted a great deal of discovery, including exchanging voluminous documents, and defendants have already asked many deposition questions about the parties' agreement, and what terms defendant did or did not comply with. Moreover, at a conference on June 23, 2020, defendant's counsel stated that if the motion to amend were granted, he would only need one or two additional depositions. (See Minute Entry dated June 23, 2020.) Accordingly, this is a narrow issue and will not cause a substantial delay.

### D. Futility

"[L]eave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).  Under New York law, there are four elements to a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Katz v. Travelers, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).  Defendant appears to concede that there was a contract, or at least that plaintiff has alleged the formation of a contract.  Indeed, defendant would be hard-pressed to argue that there was no contract, when it has put so much effort into proving that there was.  As for the alleged breach, the proposed Third Amended Complaint sets out, in a fair amount of detail, what defendant allegedly promised and what it allegedly failed to deliver.  Thus, the breach of contract claim would survive a motion to dismiss and is not futile.

### E. Judicial Estoppel

Finally, defendant argues that plaintiff should be judicially estopped from adding a breach of contract claim, since Lenco's prior counsel represented to the court in 2015 that it had no intention of pursuing a breach of contract theory.  Plaintiff admits that "[t]hat was true – at that time" but argues that "the situation has changed, and the facts have been fleshed out."  Plaintiff reiterates that "there is no prejudice, as every bit of discovery relevant to these issues [has] been addressed, discovered, discussed, [and] testified to at deposition."  (Plaintiff's Reply Memorandum of Law, dated Oct. 4, 2019, Dkt. No. 99, at 7-8.)

9

I find defendant's estoppel argument unconvincing. The doctrine of judicial estoppel applies when a party successfully assumes a position in a legal proceeding, and later assumes a contrary position to the prejudice of the party who had acquiesced to the original position. New Hampshire v. Maine, 532 U.S. 742, 749 (2001). Judicial estoppel is a discretionary and equitable doctrine intended to prevent improper use of judicial machinery. Id. at 750. When applying the doctrine of judicial estoppel, courts generally look for the existence of three factors: "(1) that a party's new position is clearly inconsistent with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Intellivision v. Microsoft Corp., 484 F. App'x 616, 619 (2d Cir. 2012) (citing New Hampshire, 532 U.S. at 750–51) (internal quotations omitted). Here, Lenco did not "successfully assume" the position that it had no breach of contract claim, and I fail to see how it is using the judicial machinery improperly by adding that claim now.

## CONCLUSION

For the reasons stated above, plaintiff's motion to amend the Second Amended Complaint to add an alternative claim for breach of contract is granted.  Plaintiff is directed to serve and file the Third Amended Complaint by July 14, 2020, and defendant will have twenty days thereafter to serve and file an Answer.  The parties are directed to submit a proposed joint schedule for completing discovery within thirty days of the date of this Memorandum and Order.

SO ORDERED.

Dated:  Brooklyn, New York
July 7, 2020

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge